**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUZY ARKU-NYADIA, <br><br>　　　　　Plaintiff, <br><br>v. <br><br>LEGAL SEA FOODS, LLC, <br><br>　　　　　Defendant. | Case No. 18-1089 (SDW) (LDW) <br><br>**OPINION** <br><br>October 16, 2020 |

**WIGENTON**, District Judge.

Before this Court is Defendant Legal Sea Foods, LLC's ("Defendant" or "LSF") Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction over this action pursuant to 28 U.S.C § 1332. Venue is proper pursuant to 28 U.S.C. § 1441(a). This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

**I.　　BACKGROUND AND PROCEDURAL HISTORY**

This lawsuit arises from Plaintiff Suzy Arku-Nyadia's ("Plaintiff") race and gender discrimination claims against her former employer. Plaintiff, a Black woman, was born in Ghana and moved to the United States in 1999 to pursue her bachelor's and master's degrees. (D.E. 79 ¶¶ 1–3.)[1] She worked at various LSF locations for 15 years, until her termination in June 2017. (*Id.* ¶¶ 5, 8.) The following events preceded the instant suit.

---

[1] Record citations in this opinion are generally to Defendant's Statement of Material Facts Not in Dispute (D.E. 68-1), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (D.E. 73-1), Plaintiff's Supplemental

### A. Plaintiff's Employment History and Workplace Environment

Plaintiff began working for LSF in April 2002 as a hostess at its Crystal City, Virginia location, and she was promoted to server in 2004. (*Id.* ¶¶ 8, 9.) She transferred to the company's Short Hills, New Jersey location later that year. (D.E. 73-1 ¶ 5.) In October 2007, Plaintiff transferred to LSF's White Plains, New York location where she was promoted to Checker, a supervisory-type position akin to "head waitress." (*See id.* ¶¶ 8–10, 13; D.E. 79 ¶¶ 11, 13, 14.)[2] In 2014, LSF closed its White Plains location and Plaintiff transferred to the company's Paramus, New Jersey location. (*Id.* ¶ 12.) Plaintiff maintained her Checker position for approximately five years, until she was demoted on September 1, 2015 by Joshua DiMura ("DiMura"), General Manager of the Paramus location. (*Id.* ¶¶ 16, 17.)

On June 27, 2014, LSF's Paramus location hired Louis Vetsas ("Vetsas") as an Assistant General Manager; it later promoted him to General Manager in February 2017 when DiMura was transferred to Short Hills. (D.E. 73-1 ¶ 27; D.E. 79 ¶¶ 26–27.) While managing the Paramus restaurant, Vetsas made multiple racist statements to Plaintiff, including, *inter alia*, that "Black people like their fish 'n chips, " "like their fried food," "like to take advantage of the system," and "lie," and that there are "too many immigrants coming in" and "[a]ll immigrants have to go back to where they come from because they are taking our jobs." (*Id.* ¶¶ 43–48.) There is conflicting testimony in the record as to whether these statements were "stray remarks" or "repeatedly made." (*Id.*) There is also conflicting testimony as to whether Vetsas treated Plaintiff differently from White servers by ordering her to leave early when business was slow, regularly assigning her to

---

Statement of Material Facts (D.E. 73), and Defendant's Response to Plaintiff's Supplemental Statement of Material Facts (D.E. 79), as well as the record citations contained therein.

[2] The Checker checks other waitstaff before they clock out to ensure that all work duties are completed. (D.E. 73-1 ¶ 14.) Furthermore, the Checker has a preferred table section and the longest shift (first and last tables), allowing him or her to make more money. (*Id.*)

tables with Black guests, and removing her from serving larger tables or requiring her to share them with another server. (*Id.* ¶¶ 55, 56.)

Plaintiff testified that she complained about Vetsas's racist statements and discrimination to her superiors, including multiple times to Vetsas himself and on two occasions to DiMura when Dimura was General Manager of the Paramus location. (D.E. 79 ¶¶ 63–68.) Plaintiff additionally testified that, when DiMura was transferred to Short Hills, she specifically asked him not to recommend Vetsas for the General Manager position in Paramus because Vetsas "was a racist." (*Id.* ¶ 92.) Under LSF policy, managers are required to report complaints of racism to Human Resources. (*Id.* ¶ 69.) However, both Vetsas and DiMura testified that they never heard any complaints of racism from Plaintiff, and neither manager filed any such report with Human Resources. (*See id.* ¶¶ 63–71.) Vetsas additionally testified that he was promoted to General Manager on DiMura's recommendation. (*Id.* ¶ 93.)

### B. Plaintiff's Disciplinary History

Plaintiff's 15-year tenure is considered "extremely long" for a server at LSF. (D.E. 79 ¶ 7.) During that tenure, she received multiple Notices of Disciplinary Action ("Notices") from various managers. Over two years at the Crystal City location, Plaintiff received two Notices for scheduling issues and one Notice for tardiness. (D.E. 73-1 ¶ 4.) During her three years at the Short Hills location, Plaintiff received one Notice for an incomplete credit card transaction, two Notices for horseplay, one Notice for use of a guest restroom, and one Notice for scheduling issues. (*Id.* ¶ 6.)[3] Over seven years at the White Plains location, Plaintiff received one Notice for tardiness and five Notices for serving-related issues. (*Id.* ¶ 12.) She also received three Counselling Logs—

---

[3] The scheduling-related Notice resulted from a miscommunication; in response, Plaintiff called LSF's corporate headquarters to complain of discrimination by her manager, leading to a mutually agreed transfer to LSF's White Plains location. (D.E. 73-1 ¶¶ 6–10.)

a lesser form of written discipline—for failure to take a mandatory break, failure to tip out correctly, and horseplay. (*Id.*; *see* D.E. 79 ¶ 82.) The overall record indicates that Plaintiff did not receive discipline frequently or for major issues prior to her transfer to LSF's Paramus location. This is supported by Plaintiff's promotion to Checker in White Plains, a position that required Plaintiff to be a "leader" and "role model" without significant customer complaints or disciplinary issues. (*See* D.E. 73-1 ¶ 14; D.E. 79 ¶ 15.)

However, at the Paramus location, Plaintiff was demoted from her Checker position and received more frequent and more serious forms of discipline. On June 9, 2015, Plaintiff received her first "Final Written Warning," which is an elevated form of discipline for an "extremely serious" and "job threatening" infraction. (D.E. 79 ¶¶ 73, 74.) The Final Written Warning was written by Vetsas and delivered by DiMura, for using profanity when Vetsas questioned her. (*Id.* ¶ 74.) During her deposition, Plaintiff testified that she never used profanity in her interaction with Vetsas and that she later complained to DiMura that Vetsas's discipline was motivated by racism. (*Id.* ¶¶ 75, 76.) On August 20, 2015, DiMura (with Vetsas as witness) gave Plaintiff another Final Written Warning and suspended her for four shifts for not ringing in a bowl of lobster bisque that she comped for her boyfriend. (*Id.* ¶ 77.) Similarly, on April 24, 2016, Plaintiff received a third Final Written Warning for not ringing in a beverage. (*Id.* ¶ 80.) Plaintiff testified that she paid for both items (a soda and a soup) and that it was common practice for wait staff to "comp" (*i.e.*, purchase) small items for regular customers without management approval. (*Id.* ¶¶ 78, 80.) On May 29, 2017, Vetsas moved to assess Plaintiff with another Final Written Warning for serving too many guests on a day when the restaurant was short-staffed. (*Id.* ¶ 82.) However, that discipline was later converted to a Counselling Log because Plaintiff was just "trying to do the right thing" by covering the shortfall. (*Id.* ¶ 82.)

### C. The Lobster Ravioli Incident

Plaintiff received her *final* Final Written Warning on June 1, 2017. LSF employees are permitted to order certain low-cost food items for free as an employee meal. (D.E. 79 ¶ 97.) If an employee orders an item that is not an approved free item, he or she must pay half price. (*Id.*) That evening, Plaintiff ordered blackened chicken over linguine, a free item which Vetsas knew to be her regular order. (*Id.* ¶¶ 98, 99.) However, the restaurant was out of linguine. (*Id.* ¶ 100.)

What followed is a matter of factual dispute. Plaintiff testified that she asked the cook to substitute "fish ravioli," an acceptable substitution from the children's menu consisting of fish-shaped cheese ravioli. (*Id.* ¶ 101.) The cook, a non-native English speaker, misunderstood and substituted lobster ravioli, which Plaintiff does not like and is not a free item. (*Id.* ¶¶ 102–04.)

According to Vetsas's testimony, the cook reported to the kitchen manager that Plaintiff ordered lobster ravioli for herself without ringing it in. (D.E. 73-1 ¶ 35.) When the kitchen manager informed Vetsas, he investigated and called LSF's regional manager, Earl Howard ("Howard"), for guidance. (*Id.*) Howard advised him to call Leah Hamilton ("Hamilton")—the Human Relations Manager at LSF's corporate headquarters in Boston—for direction, which he did. (*Id.*; *see id.* ¶¶ 27, 37.) Following their initial conversation, Hamilton called Vetsas on June 4 and approved Plaintiff's termination for violating the employee meal policy. (*See id.* ¶¶ 38–40.)

On June 6, LSF terminated Plaintiff's employment. (D.E. 79 ¶ 111.) Vetsas provided Plaintiff with a Termination Notice, but she refused to sign the document. (*Id.*)

### D. Post-Termination

On June 8, Plaintiff emailed Howard, Hamilton, LSF's Chief Operating Officer, and LSF's Executive Director of Human Resources to complain about Vetsas's abusive workplace conduct and request "an honest and thorough investigation." (D.E. 73-1 ¶ 41, D.E. 79 ¶ 117.) In her email,

5

Plaintiff did not explicitly allege racism, but she did accuse Vetsas of "spew[ing] polemical politics which are neither solicited no[r] appropriate for the work[]place." (D.E. 73-1 ¶ 41.)

LSF's policy requires complaints of harassment, discrimination, and unfair treatment to be formally investigated, including an inquiry into whether the employee asserts that the alleged conduct is based on race, gender, or another protected characteristic. (*See* D.E. 79 ¶¶ 123, 129.) Such investigations must be commenced in conjunction with Human Resources within 24–48 hours of receipt of the complaint. (*See id.* ¶ 123.) However, no one from LSF's corporate office reached out to Plaintiff to investigate her complaint. (*Id.* ¶ 127.)[4]

Plaintiff initiated the instant suit on December 22, 2017, in the Superior Court of New Jersey, Law Division, Essex County, and Defendant removed the case to this Court on January 26, 2018. (D.E. 1.) Plaintiff's Complaint alleges disparate treatment (Count One), retaliation (Count Two), and a hostile work environment (Count Three) in violation of the New Jersey Law Against Discrimination ("NJLAD"). (*Id.* at 16–18.) Following discovery, Defendant filed the instant Motion for Summary Judgment and briefing was timely completed. (D.E. 68, 72, 79.)

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact

---

[4] Howard did testify, however, that he investigated Plaintiff's complaint by asking three non-African American employees at the Paramus location whether Vetsas had ever "treated [them] unfairly" or "belittled" them, which they denied. (D.E. 79 ¶ 131.)

6

"might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate

7

the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

### III. DISCUSSION[5]

#### A. Disparate Treatment (Count One)

Under the NJLAD, employers are prohibited from discriminating against individuals with respect to compensation, terms, conditions, or privileges of employment, based on race. N.J. Stat. Ann. § 10:5-12(a). A plaintiff who has circumstantial or direct evidence of racial discrimination can bring a claim under the "pretext theory" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016); *Byrd v. Lynch*, Civ. No. 10-0247, 2011 WL 2680572, at *4 (D.N.J. July 8, 2011) (explaining that Title VII and NJLAD claims are analyzed under the same evidentiary frameworks). The plaintiff must show that her protected status was a "determinative factor" in the defendant's adverse employment decision. *Connelly*, 809 F.3d at 788 (citation omitted). However, "a plaintiff need not necessarily show 'pretext' but may prevail simply by showing, through direct or circumstantial evidence, that the challenged action resulted from discrimination." *Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 214 n.5 (3d Cir. 2000) (citation omitted).

Under the *McDonnell Douglas* three-part burden-shifting framework, the plaintiff bears the initial burden of establishing that: (1) she is a member of a protected class; (2) she was otherwise qualified for the position; (3) she has suffered an adverse employment action; and (4) the adverse action occurred under circumstances that give rise to an inference of discrimination.

---

[5] The Discussion here is limited to Plaintiff's race-based discrimination claims.

*See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999).  At the second step, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer satisfies this burden, at the third step, the burden shifts back to the plaintiff to show that "there is sufficient evidence from which a jury could conclude" that the employer's purported reason for the adverse employment action was "in actuality a pretext for intentional race discrimination."  *Jones*, 198 F.3d at 412.

Here, Plaintiff has set forth sufficient facts to satisfy part one under *McDonnell Douglas*. The first three elements of Plaintiff's *prima facie* case are met because she was a Black server with 15 years of experience who was demoted and later terminated from her employment.  (D.E. 79 ¶¶ 1, 5, 16.)[6]  Although Defendant points to Plaintiff's disciplinary history to argue that she was unqualified, the negative marks prior to her transfer to LSF's Paramus location were relatively minor and did not hinder her promotion to Checker.  (*See* D.E. 73-1 ¶ 14; D.E. 79 ¶ 15.)

The fourth element is also met.  An inference of discrimination "c[an] be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus."  *Golod v. Bank. of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).  Plaintiff has testified to being subjected to racist comments by Vetsas (*e.g.*, "Black people like their fish 'n chips, " "like their fried food," "like to take advantage of the system," and "lie"; "too many immigrants coming in"; and "[a]ll immigrants have to go back to

---

[6] Although Defendant's initial removal of Plaintiff from her "Checker" shift occurred outside of the statute of limitations and is not independently actionable, Defendant made ongoing weekly decisions not to schedule Plaintiff for "Checker" shifts, and the demotion was part of a continuous pattern of conduct that continued into the statute of limitations period.  *See Wilson v. Wal-Mart Stores*, 158 N.J. 263, 272 (1999) ("When an individual is subject to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases.").

9

where they come from because they are taking our jobs"). (D.E. 79 ¶¶ 43–48.) She has also testified that Vetsas treated her differently from White servers by ordering her to leave early when business was slow, regularly assigning her to tables with Black guests, and removing her from serving larger tables or requiring her to share them with another server. (*Id.* ¶¶ 55, 56.) She further testified that she was disciplined for conduct that White coworkers were not punished for, including purchasing items for guests and serving too many tables when the restaurant was short-staffed. (*See id.* ¶¶ 78, 80, 82.)

At step two, Defendant has produced evidence that Plaintiff was terminated for legitimate, nondiscriminatory reasons, namely that she received lobster ravioli without ringing in the item or paying for it, after multiple disciplinary issues, including two Final Written Warnings for serving items to guests without ringing them in or paying for them. (*See* D.E. 68-2 at 33–34; D.E. 73-1 ¶¶ 39, 40.)

At step three, "the plaintiff must 'either (i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 36 (3d Cir. 2017) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Here, Plaintiff testified that her frequent disciplinary marks at the Paramus location were unwarranted because she in fact paid for the items at issue for two of her Final Written Warnings and did not order the lobster ravioli that led to her termination. (D.E. 79 ¶¶ 78, 80, 98–101.)

Plaintiff also points to circumstantial evidence that racial discrimination may have been the cause of her demotion and termination. In addition to allegedly making racist comments directly to Plaintiff, Vetsas has a history of making racist comments on social media and

communicating with others to exchange racist views. (*See* D.E. 73 ¶¶ 34–39.)[7] As Plaintiff's manager, Vetsas played a significant role in both Plaintiff's termination and the disciplinary actions leading up to it, and his discriminatory comments are therefore probative. *See Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1215 (3d Cir. 1995) (explaining that "discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination [and] they are highly relevant").

Similarly, DiMura, who removed Plaintiff from her Checker shifts and delivered some of the disciplinary Notices leading up to her termination, has a history of complaints of racial discrimination filed against him by employees he managed. These include, *e.g.*, (1) in September 2015, D.J., the only other African American female server at the Paramus restaurant, complained to Hamilton that DiMura refused to promote her to "Checker" based on her race and instead selected less experienced White employees; (2) in November 2017, Sydney Wilson, an African American hostess, complained to Hamilton that DiMura held African American employees to a higher standard than White employees; (3) in September 2019, T.S., an African American employee, complained to Hamilton about DiMura's racist behavior and statements and his failure to report a written complaint of discrimination; and (4) in November 2017, C.W., an African American hostess, complained to Hamilton that DiMura had unfairly disciplined her for conduct that White employees were not punished for. (*See* D.E. 79 ¶¶ 132–68.)[8] Taken together, such

---

[7] For example, on August 12, 2017, Vetsas and another individual corresponded about the Unite the Right Rally in Charlottesville, Virginia: "White people who are proud of there [sic] heritage" are being discriminated against, while "racist black people, or brown people just gang up, and riot" and "hundreds of blacks riot, loot, murder, destroy, public and private property . . . ." On August 23, 2017, Vetsas and the same individual corresponded in support of Confederate monuments: "This is why you stop the infantile, mentally disturbed, anti-American, DUMB F[***] LIBERALS in their tracks . . . time to stomp out liberalism" and "Muslims have been saying how they would conquer the west." (D.E. 73 ¶ 35.)

[8] Shortly following these complaints, LSF promoted D.J. to Checker but terminated Sydney Wilson, T.S., and C.W. (D.E. 79 ¶¶ 139, 149, 162, 168.)

"testimony by employees about discriminatory actions by the defendant-employer similar to those alleged by the plaintiff is admissible to prove the employer's motive or intent to discriminate" in an NJLAD claim. *See Rendine v. Pantzer*, 141 N.J. 292, 309 (1995).

In sum, Plaintiff has provided evidence that would allow a factfinder to reasonably infer that Defendant's proffered non-discriminatory reasons for terminating Plaintiff were pretextual. *See Andes v. N.J. City Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011) (explaining that at the motion for summary judgment stage, "the plaintiff need only raise doubt as to the legitimacy of the defendant's proffered reason for its adverse action; it need not prove its discrimination case"); *see also Michaels v. Rutgers Univ. N.J. Med. Sch.*, Civ. No. 15-7603, 2019 WL 625804, at *11 (D.N.J. Feb. 14, 2019) (citing *Fuentes*, 32 F.3d at 764). As such, this Court finds that Plaintiff has raised material issues of fact that preclude summary judgment as to Count One.

### B. Retaliation (Count Two)

"An employee's retaliation claims are subject to the *McDonnell Douglas* three-part burden-shifting framework[.]" *Anderson v. Boeing Co.*, 694 F. App'x 84, 88 (3d Cir. 2017). In order to establish a retaliation claim, an employee must first submit evidence showing that "(1) she engaged in a protected activity under [the NJLAD]; (2) the employer took an adverse action against her; and (3) there was a causal connection between the employee's participation in the protected activity and the adverse employment action." *Hashem v. Hunterdon Cty.*, Civ. No. 15-8585, 2016 WL 5539590, at *15 (D.N.J. Sept. 29, 2016) (citation omitted). If the employee establishes a *prima facie* case of retaliation, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Anderson*, 694 F. App'x at 86. If the employer's burden is met, the burden shifts back to the employee to "show by a preponderance of the evidence that the employer's proffered reason is pretextual." *Id.*

This Court finds that Plaintiff can establish her *prima facie* case for retaliation. Opposing discrimination made unlawful by the NJLAD qualifies as a "protected activity." *See Moore v. Beers*, 121 F. Supp. 3d 425, 431 (D.N.J. 2015) (citing *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006)); *see also* N.J. Stat. Ann. § 10:5-12(d). Here, Plaintiff has testified that she complained multiple times about Vetsas's racist statements and discrimination to her superiors, including multiple times to Vetsas himself and on two occasions to DiMura when Dimura was General Manager of the Paramus location. (D.E. 79 ¶¶ 63–68.) Such "informal protests" against perceived discrimination constitute "protected activity." *See Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 135 (3d Cir. 2006). The managers were required by company policy to report the complaints of racism to Human Resources. (*Id.* ¶ 69.)

Plaintiff can establish a causal connection between her protected activity and Defendant's adverse employment actions in pertinent part through "(1) timing, and (2) a pattern of antagonism." *Dorvil v. Burlington Coat Factory Warehouse Corp.*, No. 09-5778, 2011 WL 4899976, at *5 (D.N.J. Oct. 14, 2011) (citation omitted). Following her complaints, Plaintiff testified that she was (1) demoted from the Checker position that she held for five years; (2) given Final Written Warnings for the first time in her career; (3) treated differently from White servers by being ordered to leave early when business was slow, regularly assigned to tables with Black guests, and removed from serving larger parties without sharing them; (4) severely disciplined for purchasing small items for guests; (5) disciplined for serving too many guests when there was a staff shortage; and (6) terminated for receiving an item that she did not order. (*See* D.E. 79 ¶¶ 52, 55, 56, 73–82, 101–04); *see also Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 448 (2003) (explaining that "adverse employment action" can include "many separate but relatively minor instances of behavior directed against an employee that may not be actionable individually but that combine to make up a pattern of retaliatory conduct"). Almost all of these adverse actions were done by

13

Vetsas or DiMura.[9] Thus, Plaintiff has provided sufficient evidence to shift the burden to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.

As discussed above, Defendant has met its burden by producing evidence that Plaintiff was fired for receiving lobster ravioli without ringing in the item or paying for it, after other similar incidents. In turn, Plaintiff has raised issues of fact to support the inference that the proffered reasons for her termination were pre-textual, including (1) Vetsas's history of racist comments, (2) DiMura's history of employee complaints of racial discrimination, (3) Defendant's pattern of terminating employees shortly after they complained to the corporate office about DiMura's discriminatory behavior, and (4) Defendant's failure to formally investigate Plaintiff's written complaint against Vetsas that was sent to the corporate office. (*See* D.E. 79 ¶¶ 43–48, 127, 132–68.) A reasonable jury could resolve these fact issues in Plaintiff's favor and conclude that she was fired in retaliation for her protected activity. Therefore, Defendant's motion for summary judgment is denied as to Count Two.

### C. Hostile Work Environment (Count Three)

To establish a race-based hostile work environment claim under the NJLAD, an African American plaintiff must "demonstrate that the defendant's 'conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.'" *Caver v. City of Trenton*, 420 F.3d 243, 262 (2005)

---

[9] To the extent Defendant argues that Plaintiff was terminated by Hamilton, there is an issue of fact as to whether Hamilton made the decision unilaterally or on Vetsas's recommendation. (D.E. 73-1 ¶¶ 36, 38, 39.) Regardless, it is clear that Vetsas played a major role in Plaintiff's termination, precluding summary judgment. (*Id.* ¶¶ 35–40); *see Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate."); *cf. Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) ("We therefore hold that if a supervisor performs an act motivated by [prohibited] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .").

(alterations in original) (quoting *Taylor v. Metzger*, 706 A.2d 685, 688–89 (N.J. 1998)); *see also Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 941 (3d Cir. 2009) ("New Jersey courts treat hostile work environment claims under the NJLAD the same as the Supreme Court treats hostile work environment actions under Title VII.").

All four requirements are met here.  First, this Court notes that Plaintiff's claim need not be predicated on overt, derogatory references to her race, although Vetsas did make such references to Plaintiff's race.  The Third Circuit has cautioned that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."  *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001) (citation omitted).  For the reasons discussed above, Plaintiff has raised genuine issues of material fact that would permit a reasonable jury to infer that Vetsas's and DiMura's treatment of Plaintiff was racially motivated.

Defendant also argues that the alleged discriminatory conduct was neither severe nor pervasive enough to support a hostile work environment claim.  (D.E. 68-2 at 41–42.)  When determining whether an environment is hostile, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (citation omitted).  Plaintiff testified that Vetsas and DiMura unreasonably interfered with her work performance by misapplying their managerial authority to remove her from favorable shifts and tables, send her home early, assign her to African American customers, demote her from Checker, and subject her to severe discipline and overly strict scrutiny not extended to White co-workers.  (*See* D.E. 79 ¶¶ 52, 55, 56, 73–82, 101–04.)  That this treatment

was severe or pervasive enough to make a reasonable African American believe that her working environment is hostile or abusive is evidenced by the complaints made by D.J, Sydney Wilson, T.S., and C.W over similar conduct. (*See* D.E. 79 ¶¶ 132–68.) A trier of fact could reasonably find that Plaintiff suffered persistent racial discrimination in her workplace, and that at a minimum it interrupted her ability to perform her job duties. As such, Defendant's motion for summary judgment is denied as to Count Three.

## IV.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is **DENIED** with respect to Plaintiff's race discrimination claims. Plaintiff has not presented sufficient evidence to support her gender discrimination claims, and Defendant's Motion for Summary Judgment with respect to those claims will be **GRANTED**. An appropriate Order follows.

s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON**
**UNITED STATES DISTRICT JUDGE**

Orig:         Clerk
cc:           Hon. Leda D. Wettre, U.S.M.J.
              Parties